WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lula Ben Bitah,<br><br>    Plaintiff,<br><br>v.<br><br>Office of Navajo and Hopi Indian Relocation,<br><br>    Defendant. | No. CV-24-08067-PCT-DJH<br><br>**ORDER** |

Plaintiff Lula Ben Bitah ("Ms. Bitah" or "Plaintiff") has filed an administrative appeal challenging the denial of her relocation benefits under 25 C.F.R. § 700.147. (Doc. 1). Plaintiff filed a Motion for Summary Judgment, arguing that the decision of the Independent Hearing Officer ("IHO") is unsupported by substantial evidence and is arbitrary, capricious and contrary to law. (Doc. 16). Defendant, the Office of Navajo and Hopi Indian Relocation ("Defendant" or "OHNIR"), has filed a Response and its own Cross-Motion for Summary Judgment. (Doc. 19). This matter is fully briefed and ripe for review. (Docs. 24 & 30). Upon review of the briefs and the Administrative Record (Docs. 9–13, "AR"), the Court reverses the IHO's December 2023 decision (the "2023 Decision") and remands this matter to OHNIR for further proceedings.

**I.    Background**

    **A.    Background and History of the Navajo–Hopi Settlement Act**

This case arises from the Navajo–Hopi Settlement Act ("the Act"), Pub. L. No. 93-531, 88 Stat. 1712 (Dec. 22, 1974). In 1882, "a 2.5-million-acre reservation in northeastern

Arizona [was established] for use by the Hopi Indians" and "such other Indians as the Secretary of the Interior may see fit to settle thereon" by President Chester Arthur. *Bedoni v. Navajo-Hopi Indian Relocation Comm'n*, 878 F.2d 1119, 1121 (9th Cir. 1989) (citing Exec. Order of December 16, 1882). "Members of the Navajo Tribe subsequently migrated to the reservation and settled. The Hopi and Navajo Tribes coexisted on the 1882 reservation for 75 years, but became entangled in a struggle as to which Tribe had a clear right to the reservation lands." *Id*.

In 1962, due to controversy between the two Tribes, the U.S. District Court for the District of Arizona determined that the Hopi and Navajo Tribes held joint, undivided and equal interest in five-sixths of the reservation. *See Healing v. Jones*, 210 F. Supp. 125 (D. Ariz. 1962), *aff'd per curiam*, 373 U.S. 758, (1963). This jointly held area is referred to as the Joint Use Area ("JUA"). *Id*. The establishment of the JUA "failed to solve the inter-tribal conflicts over the lands thereon." *Bedoni*, 878 F.2d at 1121–22.

In 1974, as a response to the continued strife, Congress passed the Act. Pub. L. No. 93-531, 88 Stat. 1712 (Dec. 22, 1974). The Act "provided for the appointment of a mediator to assist in negotiating a settlement and partition of the JUA." *Bedoni*, 878 F.2d at 1121. "In the event that the mediator's efforts failed, the statute granted the district court residual authority to make a final partition of the JUA." *Id*.

These mediation efforts did fail, so, the Act directed the creation of the Navajo–Hopi Indian Relocation Commission's ("NHIRC") which was "commissioned with the task of relocating Navajo and Hopi residents." *Id*. The Act authorized a court-ordered partition of the former JUA occupied by Navajo and Hopi residents and created the Navajo Partitioned Lands ("NPL") and the Hopi Partitioned Lands ("HPL"). *See id*. at 1121–22. The scope of the NHIRC's authority included "the disbursement of funds equivalent to the "reasonable cost of a decent, safe, and sanitary replacement dwelling to accommodate [a displaced] household." *Id*. at 1122.

Under the Act, enrolled members subject to relocation from land partitioned to the other Tribe may qualify for relocation benefits and assistance. *See* 25 C.F.R. § 700.138.

The Settlement Act also created ONHIR, which provides services and benefits for relocation of individuals who resided on land that was allocated to the other tribe. *See Stago v. Off. of Navajo & Hopi Indian Relocation*, 562 F.Supp.3d 95, 100 (D. Ariz. 2021) (citing *Bedoni*, 878 F.2d at 1121–22). The Act places upon ONHIR "an affirmative duty to manage and distribute the funds appropriated pursuant to the Settlement Act such that the displaced families receive[] the full benefits authorized for them. In other words, ONHIR has a duty only to disburse benefits to those authorized to receive them under the [] Act." *Id.* at 106 (citation omitted).

### B.  Factual and Procedural Background of Ms. Bitah's Application

Plaintiff is an enrolled member of the Navajo Nation. (AR at 1387). Plaintiff was born on May 20, 1958, in the Red Lake area and turned eighteen on May 20, 1976. (Doc. 17 at 5; Doc. 20 at 5). Plaintiff's family formerly lived in the Red Lake Chapter in an area that was partitioned for the use of the Hopi Tribe. (*Id.*) Plaintiff applied for Relocation Benefits (the "Application") on August 3, 2009. (AR at 1387). In the Application, Plaintiff stated that the first calendar year that she earned more than $1,300.00 was 1978. (*Id.*) Plaintiff further stated she did not remember the exact date she moved from the Hopi Partition Lands ("HPL"). (*Id.*) ONHIR denied Plaintiff's Application in 2012, noting that she was not eligible for relocation benefits because "[a]s of June, 1975 and April, 1976, [she] was not a Head of Household." (*Id.* at 1387—88). OHNIR also noted that Plaintiff's Social Security Earnings Statement ("SSE") reflects Plaintiff earned $748 in 1975, $668 in 1976, $0 in 1977 and $1,833 in 1978. (*Id.* at 1388).

Plaintiff appealed OHNIR's denial of her benefits and a hearing was held before the IHO in 2014 ("the First Hearing"). (*Id.*) Plaintiff testified at the hearing, in pertinent part:

- She attended a Bureau of Indian Affairs ("BIA") boarding school during her freshman, sophomore and junior years of high school and graduated from a new school in Tuba City her senior year. (AR at 1389).
- She worked as a maid in the summers of 1972 and 1973 and a waitress in 1974 and 1975 in Page, Arizona. As a waitress, she worked 37–40 hours

         per week for 13 weeks and earned $3.35 an hour plus tips. She stated her tips were "$3.00 on up." (*Id*.)

- Plaintiff also testified that she would weave rugs for sale and would sell four to five rugs a month during the summers for $100 and up. She would weave about 20 rugs per year that her mother would sell. (*Id*. at 1390).

After the First Hearing, the IHO found Plaintiff was not entitled to relocation benefits because she was "a dependent minor" as her basic needs for food and shelter were provided by others. (*Id*. at 1394). The IHO also found that Plaintiff's testimony regarding her work history was "insufficient to determine that Applicant was a self-supporting head of household at any time before . . . June 7, 1975." (*Id*.) Plaintiff then sought review under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701 *et seq*., in this Court in 2020. (*Id*.)

Upon review, this Court reversed and remanded the IHO's decision in 2022, finding that its "decision to apply the June 7, 1975, move-off date without explanation, reasoning, or discernable reliance on the regulations for his decision was both arbitrary and capricious." (AR at 1395). It stated that the use of the June 7, 1975, move-off date "runs counter to the record of evidence" because Plaintiff's father testified that the construction of the Navajo Partition Lands ("NPL") home "was not completed [until] April 1976." (*Id*.)

Another hearing was held in 2023 and Plaintiff again testified. (*Id*.) She testified, in pertinent part, that:

- She was raised in Red Lake (Lower Tonalea), which was located on land later portioned to the Hopi tribe. (*Id*. at 1396).
- The BIA boarding school in Richfield, Utah, provided plaintiff with room and board—which included meals. While there, she worked in the kitchen or dormitory and made approximately $80 per month, which was not reported for tax purposes. (*Id*. at 1396–97).
- As a waitress, her tips would range from $10 to $20 and that she earned $400 total in tips during the summers. She had a Monday through Friday, 8:00am

- 4 -

- to 5:00pm schedule. (*Id*. at 1397).
- When working in Page, she would sometimes stay in her Uncle's "shack" and other times, she and her father would drive home—which was about an hour away. (*Id*. at 1398).
- The proceeds from the rugs Plaintiff would weave were used to help her family with food, laundry and "everything." She stated that it would take between two days and a month to make a rug depending on the size and design. Plaintiff wove and sold 15 to 20 rugs in the summer of 1975, which she wove at the HPL homesite. She stated that the average proceeds for a rug were between $150 and $250. (*Id*. at 1399).

Based on Plaintiff's testimony at the Second Hearing, the IHO found that she was not credible about her pay. (AR at 1405). He reasoned that, in 1972, the federal minimum wage was $1.60, and in 1976, it was raised to $2.20. (*Id*.) The IHO stated that Plaintiff "did not provide any explanation as to why, as a teenager yet to earn a high school degree, she would have been paid significantly more than minimum wage." (*Id*.) The IHO noted that, over a 13-week summer, Plaintiff would have worked approximately 481 hours if she had been working 37–40 hours per week; which would result in earnings of $1,611.35. (*Id*. at 1405–06). He stated that there is a "vast discrepancy between [Plaintiff's] claimed hours worked, her claimed wage earned, and the earnings actually reported on the SSE." (*Id*. at 1406). The IHO also noted the discrepancy in Plaintiff's testimony about her tips: from "$3 on up" to between "$10 and $20." (*Id*.) The IHO specifically noted that

> [i]n 1975, it was customary to leave a 15% tip for meal service. By Ms. Bitah's estimates at Hearing II, that means that meals for her customers were generally costing between $67 and $135 (if customers were leaving $10-$20 tips at 15% of the bill). However, the average cost a meal out in 1975 was approximately $3.00 to $5.00. Ms. Bitah did not explain why customers in Page, Arizona, would regularly spend so much on a diner meal, or alternatively, why they would leave such generous tips on more modest bills.

(*Id*. at 1406–07 (citing *The Psychology of Restaurant Tipping*, Michael Lynn, UNIVERSITY OF NORTH CAROLINA BIBB LATANE, OHIO STATE UNIVERSITY, 2, 6 (1984)). Based on the

above discrepancies, the IHO concluded that "[a] logical explanation for [Plaintiff's] testimony is that she inflated her claimed wage earnings and tips in order to appear as though she could meet [the] HoH eligibility requirements for the summers she worked in Page." (*Id*. at 1407).

The IHO also addressed Plaintiff's rug weaving and found that:

> From a logistical standpoint, Ms. Bitah's time on the HPL was likely limited due to varying schedules that included weekend work (which makes sense in the tourist trade) and the hour commute from Page to the HPL homesite. Also, between June 1975 and April 1976, the family was staying with Ms. Bitah's uncle in Page and in transition from the HPL to the NPL. These factors limit how much time was actually available for Ms. Bitah and her family to dedicate to weaving. As a result, [she] is not credible about how many rugs she was weaving during the relevant time period.

(AR at 1408–09). The IHO also pointed out that Plaintiff suggested there may have been receipts for the sale of these rugs, but did not produce one. (*Id*. at 1409). The IHO further noted that "[t]he record also lacks reliable evidence that earnings from the rug sales flowed *to Ms. Bitah* as a self-supporting individual. Rather, it appears that the earnings were generated *by* the family and *for* the family." (*Id*.) (emphasis in original).

Due to these inconsistencies the IHO found that "the record lacks 'credible, direct, and specific evidence' that the Applicant was a HoH on April 3, 1976, when she moved off the HPL." (AR at 1426 (citing *De Valle v. Immigr. & Naturalization Serv*., 901 F.2d 787, 792 (9th Cir. 1990)). Now, for the second time, Plaintiff seeks review in this Court of the denial of her relocation benefits. (Doc. 1).

**II.    Legal Standard**

"Unless Congress specifies otherwise, we review agency action under the [APA]." *Hopi Tribe v. Navajo Tribe*, 46 F.3d 908, 914 (9th Cir. 1995). When conducting judicial review under the APA, "the reviewing court can reverse only if the agency action was arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence." *Bedoni v. Navajo–Hopi Indian Relocation Comm'n*, 878 F.2d 1119, 1122 (9th Cir. 1989) (citing 5 U.S.C. § 706(2)(A), (E); *Walker v. Navajo–Hopi Indian*

1 *Relocation Comm'n*, 728 F.2d 1276, 1278 (9th Cir. 1984)).

2 The "arbitrary and capricious" standard dictates that "a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 42 (1983). The "standard is narrow and a court is not to substitute its judgment for that of the agency." (*Id.* at 43). The "arbitrary and capricious standard is 'highly deferential, presuming the agency action to be valid and [requires] affirming the agency action if a reasonable basis exists for its decision." *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000)).

The "substantial evidence" level of proof requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Nat'l Fam. Farm Coal. v. EPA*, 960 F.3d 1120, 1132–33 (9th Cir. 2020) (internal quotation omitted). Courts often describe this as "more than a mere scintilla but less than a preponderance." *Orteza v. Shalala*, 50 F.3d 748, 749 (9th Cir. 1995). The reasoning rests in the "fundamental principle that an agency, its experts, and its administrative law judges are better positioned to weigh conflicting evidence than a reviewing court." *Shaibi v. Berryhill*, 883 F.3d 1102, 1109 (9th Cir. 2017).

Finally, "summary judgment is an appropriate mechanism" for judicial review under the APA. *Occidental Eng'g Co. v. Immigr. & Naturalization Serv.*, 753 F.2d 766, 770 (9th Cir. 1985). "However, the agency is the fact finder and the court's role 'is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Begay v. Off. of Navajo & Hopi Indian Relocation*, 2022 WL 3285443, at *2 (D. Ariz. Aug. 11, 2022) (citing *Occidental Eng'g Co.*, 753 F.2d at 769).

. . . .

. . . .

### III. Discussion

The sole issue before the Court is whether the IHO erred in finding that Plaintiff was not a Head of Household when she moved off the HPL in 1976. (Doc. 16 at 7; Doc. 19 at 14). To qualify for relocation benefits, "the head of household and/or immediate family must have been residents on December 22, 1974, of an area partitioned to the Tribe of which they were not members." 25 C.F.R. § 700.147(a). Additionally, an applicant must have become a Head of Household on or before the earlier of the date the person left the HPL (if a Navajo) or the NPL (if a Hopi) or July 7, 1986. *See* 25 C.F.R. §§ 700.69(c), 700.147(e). So, under the Act, Plaintiff bears the burden of proving she was the "the head of household" ("HoH") on or before April 3, 1976. 25 C.F.R. § 700.147(a–b).

### A. Head of Household

ONHIR's binding regulations or policies do not identify a specific dollar amount an applicant must have earned to qualify as "self-supporting." Instead, the binding regulation requires that the applicant prove that he or she "actually maintained and supported him/herself," whatever his wages. 25 C.F.R. § 700.69(a)(2). ONHIR, however, has recognized that an applicant who earned at least $1,300 per year can make a *prima facie* showing of self-supporting status. *See Benally v. Off. of Navajo & Hopi Relocation*, 2014 WL 523016 (D. Ariz. Feb. 10, 2014).

Plaintiff argues that she was the HoH when she moved off the HPL in 1976. (Doc. 16 at 7). She points out that the IHO failed to consider or credit the $80/month she earned at school in Utah or that free food and lodging at school relieved her parents from having to pay for her food and lodging. (*Id*. at 4-5 (citing *Torpey v. Off. of Navajo & Hopi Indian Relocation*, No. CV-17-08184-PCT-SMB, 2019 U.S. Dist. LEXIS 154168 (D. Ariz. Sep. 6, 2019)). *Torpey* is indeed instructive.

In *Torpey*, the plaintiff argued that she had attained HoH status because she was attending college on a scholarship which entitled her to free tuition, room and board. *Torpey,* 2019 U.S. Dist. LEXIS 154168 at *11. The IHO denied Plaintiff relocation benefits because "[u]nlike a scholarship, grant, stipend, or loan for which an applicant

- 8 -

needs to qualify, applicant had no such restrictions — her tuition and room & board were paid by the college simply because she qualified as a member of the Navajo Nation." *Id.* at *12. The Court pointed out that scholarship grants for individuals which include funds for living expenses "should be considered in making the determination." *Id*. The Court found that the IHO's "distinction" was "arbitrary and capricious because the ***reason*** why she got free room and board along with tuition is not the point. The legally important fact is that ***her parents did not have to provide her room and board*** once she went to school." *Id*. (emphasis added).

Furthermore, the "Crytal Memo," a memorandum developed by ONHIR's first Attorney, E. Susan Crystal that the parties cite to, states that living expenses are to be used in considering self-supporting status. (AR at 581). The Memo specifically states the criteria to be used in considering self-supporting status, including: "[s]ingle individuals who have received scholarship grants from the Tribe or educational institutions, as long as the grant includes funds for living expenses. In cases where the grants are predicated on the receipt of a certain amount of income from the individual or family which is more than half of the total estimated expenses, this person would not be considered self-supporting." (*Id*.); *see also Ambrose v. Off. of Navajo & Hopi Indian Relocation*, 2022 WL 3921115, at *3 (D. Ariz. Aug. 31, 2022), *aff'd*, 2024 WL 1553706 (9th Cir. Apr. 10, 2024) (noting that a "scholarship" may be used in the self-supporting status consideration if it "includes funds for living expenses."). Black's Law Dictionary defines a "scholarship" as "[m]oney or ***other aid*** granted to help a student pursue educational achievement; esp., a discrete instance of financial aid to someone who pursues a course of study, often in an institution of higher learning." *Scholarship*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added).

In its Decision, the IHO discusses Plaintiff's room and board. He states that "the Crystal Memo does not treat scholarships for higher education as equivalent to boarding school room and board. In order to receive a scholarship, an individual typically has to apply and qualify pursuant to certain criteria. Then, the proceeds of the award are applied to educational costs. This is distinguishable from room and board provided as part of a

1    boarding school general education program." (AR at 1428). Contrary to the IHO's
2    discussion, the Crystal Memo does not mention boarding school room and board.
3    (*Id*. at 579–81). It makes no distinction between a scholarship for college and room and
4    board provided through the BIA for boarding school. (*See id*.) Instead, the Memo focuses
5    on whether an individual is granted "living expenses." (*Id*. at 581).

6    The record establishes that the BIA boarding school provided Plaintiff with room
7    and board—which included meals. (AR at 1396). A "scholarship grant from the Tribe or
8    educational institution" may be used in the self-supporting status consideration if it
9    "includes funds for living expenses." (*Id*. at 581). While the IHO is correct that
10   "individuals who were still high school students at the time of certification will be
11   scrutinized more closely and will require substantiation of income and independence to
12   rebut the normal presumption of dependence," (AR at 1418), he failed to acknowledge that
13   the "***reason***" why an individual gets free room and board is not the point of this analysis.
14   *Torpey,* 2019 U.S. Dist. LEXIS 154168 at *12. "The legally important fact is that ***her***
15   ***parents did not have to provide her room and board.***" *Id*.

16   Here, Ms. Bitah's parents did not have to provide her certain living expenses
17   including room, board and meals during the school year. (AR at 1396). This financial aid
18   should have been, but was not, considered and discussed by the IHO. *See Ambrose*, 2022
19   WL 3921115, at *3; *see also Yazzie v. Off. of Navajo and Hopi Indian Relocation*, 2024
20   WL 1904560, at *4 (9th Cir. May 1, 2024) ("ONHIR has generally included school
21   financial aid in paying living expenses as a factor weighing in favor of self-supporting
22   status…."). The IHO states later in its decision that "her boarding school residence was
23   *considered along with* claimed, yet unsubstantiated, earnings from employment, tips, and
24   rug sales." (*Id*. at 1431) (emphasis added). Yet, there is nothing in the opinion to discern
25   how the IHO's considered the amount which her room, board and meals cost—or how this
26   alleviated her or her parents from paying these costs. (*See id*. at 1428). Instead, he disposed
27   of this argument in a conclusory manner without discussing whether Plaintiff's room and
28   board amount to a scholarship. (*Id*.) This was error.

The Crystal Memo mandates only that "scholarship grants from the Tribe or educational institutions" be considered if "the grant includes *funds for living expenses*." (AR at 581) (emphasis added). This Memo does not make any distinction, whatsoever, to the educational level applicable to the grant or why the grant is given. (*See id*.) Courts should interpret this Memo based on the plain meaning of the words Ms. Crystal chose to use since the Memo is relied upon akin to binding legal authority. *See generally Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992) ("[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others," plain meaning, because "courts must presume that a legislature says in a statute what it means and means in a statute what it says there."). The plain meaning of a scholarship encompasses "other aid granted to help a student pursue educational achievement"—such as the room, board, and meal expenses that Plaintiff was given here. *See Scholarship*, BLACK'S LAW DICTIONARY.

Instead of an analysis of what a scholarship is and if Plaintiff's boarding school benefits can be recognized as such based on its plain meaning, the IHO seemed to have imported his own personal interpretation to this term. (*See* AR at 1428 ("In order to receive a scholarship, an individual[] typically has to apply and qualify pursuant to certain criteria. Then, the proceeds of the award are applied to educational costs. This is distinguishable from room and board provided as part of a boarding school general education program.")). The IHO does not explain how this interpretation aligns with the Crystal Memo nor did the IHO provide citation for his interpretation of "scholarship." (*See id*.) He also failed to recognize that the Crystal Memo allows for consideration of "scholarships" which include "funds for living expenses." (*Id*.; AR at 581).

The IHO's failure to credit Plaintiff for *any* amount of the room, board, and meal expenses provided by the BIA while she was in school was arbitrary and capricious and not supported by substantial evidence. *Torpey,* 2019 U.S. Dist. LEXIS 154168 at *14 (finding that the IHO's failure to consider Plaintiff's free tuition, room, and board was arbitrary and capricious and not supported by substantial evidence). This is especially so,

because the IHO failed to support his conclusion that Plaintiff's covered expenses did not amount to a scholarship with any supporting legal authority. *See, e.g.*, *Tsosie v. Off. of Navajo & Hopi Indian Relocation*, 771 Fed. App'x 426 (9th Cir. 2019) (remanding the IHO's decision because "it failed to articulate reasons supporting his conclusion[.]"). Thus, the Court will remand this matter to the IHO so that it may properly consider the room, board, and meal expenses she was provided through her boarding school "the same as it would consider a scholarship." *Torpey,* 2019 U.S. Dist. LEXIS 154168 at *14.

### B. Remand

"If the record before the agency does not support the agency action . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Begay v. Off. of Navajo & Hopi Indian Relocation*, 2017 WL 4297348, at *4 (D. Ariz. Sep. 28, 2017) (citation omitted). "A rare circumstance might arise where the reviewing court finds that the record clearly demonstrates an applicant's eligibility for relocation benefits." *Whitehair v. Off. of Navajo & Hopi Indian Relocation*, 2018 WL 6418665, at *5 (D. Ariz. Dec. 6, 2018) (citation omitted).

Here, further proceedings, rather than an award of benefits, are warranted. The Court reverses the IHO's decision because it failed to consider the room, board, and meals she received through the BIA while in high school. *See supra* Section III.A. In other words, the IHO has more work to do in determining whether Plaintiff was providing for her needs, *Yazzie*, 2024 WL 1904560, at *3, in light of the aid she was receiving. This may include further investigation into Plaintiff's financial aid for her living expenses and the reassessment of pertinent record evidence. Because Plaintiff's self-sufficiency or lack thereof cannot be accurately determined on the present record, the Court must remand, rather than award benefits. *See Whitehair*, 2018 WL 6418665, at *5.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 16) is **GRANTED** and Defendant's Cross-Motion (Doc. 19) is **DENIED**. The Independent Hearing Officer's December 2023 Decision (AR at 1386–1434) is **reversed** and **remanded**

1  to the Office of Navajo and Hopi Indian Relocation for further proceedings consistent with
2  the Court's Order.
3      **IT IS FINALLY ORDERED** that the Clerk of Court shall enter judgment
4  accordingly and terminate this case.
5      Dated this 17th day of September, 2025.

Honorable Diane J. Humetewa
United States District Judge